⬚ORIGINAL

Approved: _____
ELIZABETH A. HANFT / DAVID W. DENTON, JR.
Assistant United States Attorneys



Before:   HONORABLE GABRIEL W. GORENSTEIN
          Chief United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - - 18 MAG 8796

UNITED STATES OF AMERICA              :   SEALED COMPLAINT
                                      :
          - v. -                      :
                                      :   Violations of
SHERVINGTON LOVELL,                   :   46 U.S.C.
                                      :   §§ 70504(b)(2) and
                    Defendant.        :   70506
                                      :
- - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

JEFFREY E. STRATTON, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration (the "DEA"), and charges as follows:

COUNT ONE
(Conspiracy to Violate Maritime Drug Enforcement Laws)

1. From in or about April 2018 up to and including in or about July 2018, in Guyana, Jamaica, Colombia, on the high seas and elsewhere, SHERVINGTON LOVELL, the defendant, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the maritime drug enforcement laws of the United States.

2. It was a part and an object of the conspiracy that SHERVINGTON LOVELL, the defendant, and others known and unknown, while on board a vessel subject to the jurisdiction of the United States, knowingly and intentionally would and did distribute and possess with intent to distribute a controlled

substance, in violation of Title 46, United States Code, Section 70503(a)(1).

3. The controlled substance involved in the offense was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 46, United States Code, Section 70506(a) and Title 21, United States Code, Section 960(b)(1)(B).

(Title 46, United States Code, Sections 70506(b) and 70504(b)(2).)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I have been a DEA Special Agent for approximately twenty-three years. During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and have participated in numerous investigations involving international drug trafficking. I have been personally involved in the investigation of this matter. This affidavit is based on my communications with other law enforcement officers and other individuals, and on my review of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

5. Between in or about April 2018 and in or about July 2018, SHERVINGTON LOVELL, the defendant, and several co-conspirators met with two DEA confidential sources ("CS-1[1]" and "CS-2[2]," respectively, and together, the "CSes") on multiple

---

[1] CS-1 is cooperating with the DEA in exchange for payment. CS-1 has previously been convicted of a narcotics offense. Information provided by CS-1 has proven reliable and has been corroborated in part by independent evidence in this and other cases.

[2] CS-2 is cooperating with the DEA in exchange for payment. Information provided by CS-2 has proven reliable and has been

occasions at various locations in South America and the Caribbean. During the course of those meetings, LOVELL and his co-conspirators arranged for the maritime shipment of a large quantity of cocaine on board a stateless vessel provided by a co-conspirator not named herein ("CC-1"). On or about July 27, 2018, United States Coast Guard ("USCG") personnel intercepted that vessel (the "Vessel") approximately 350 miles east of Diamond Valley, Barbados. The Vessel bore no indicia of nationality, and was transporting approximately 624 kilograms of cocaine.

### The Investigation

### The April 18 Meeting

6. On or about April 18, 2018, at the DEA's direction, the CSes met with SHERVINGTON LOVELL, the defendant, CC-1, and two additional co-conspirators not named as defendants herein ("CC-2" and "CC-3") at a hotel in Georgetown, Guyana (the "April 18 Meeting"). From my review of a DEA report prepared based on the CSes' recollections of the April 18 Meeting, which was recorded, I have learned, among other things, the following:

   a. LOVELL, CC-1, CC-2, and CC-3 discussed sending a shipment of approximately 400 kilograms of cocaine to the Netherlands, for which CC-1 indicated he would provide the transportation.

   b. During the April 18 Meeting, LOVELL stated that he was looking for a way to retrieve his earnings after the cocaine was sold in the Netherlands, because LOVELL had previously laundered money from the United States and Canada, but never from the Netherlands.

### The June 5 Meeting

7. On or about June 5, 2018, at the DEA's direction, the CSes again met with SHERVINGTON LOVELL, the defendant, CC-1, and CC-2 at a residence in Montego Bay, Jamaica (the "June 5 Meeting"). Based on my review of a summary translation prepared by a DEA translator of the June 5 Meeting, which was recorded, I have learned, among other things, the following:

---

corroborated in part by independent evidence in this and other cases.

                a.    LOVELL, CC-1, CC-2, and the CSes again discussed sending a maritime shipment of cocaine to the Netherlands, to which all would contribute different quantities of cocaine, including the CSes, who would do so along with another co-conspirator ("CC-4").

                b.    CC-1 stated that the transaction would require approximately $400,000 for transportation expenses, and LOVELL, CC-2, and the CSes all agreed to provide portions of those expenses to CC-1.

                c.    CC-1 stated that he would purchase three months' worth of rations for the voyage.

                d.    CC-1 further informed the CSes, in substance and in part, that he would be using for the shipment a vessel that he had previously used in a transaction with CC-4.

                e.    CC-2 stated that he had a boat (the "Boat") equipped with a hidden compartment for storing two thousand kilograms of cocaine. From my review of a DEA report prepared based on the CSes' recollections of the June 5 Meeting, I have learned that CC-1's vessel would deliver the cocaine to the Boat off the coast of Ireland, for further transport to the Netherlands.

### The June 23 Meeting

       8.    On or about June 23, 2018, at the DEA's direction, CS-2 and two additional DEA confidential sources ("CS-3[3]" and "CS-4[4]") met with CC-1 in Georgetown, Guyana (the "June 23 Meeting"). From my review of a DEA report prepared based on the recollections of CS-2, CS-3, and CS-4 of the June 23 Meeting, which was recorded, I have learned, among other things, the following:

---

[3] CS-3 is cooperating with the DEA in exchange for payment. Information provided by CS-3 has proven reliable and has been corroborated in part by independent evidence in this and other cases.

[4] CS-4 is cooperating with the DEA in exchange for payment. Information provided by CS-4 has proven reliable and has been corroborated in part by independent evidence in this and other cases.

a.   During the June 23 Meeting, CC-1 provided CS-3 with coordinates at which the CSes' boat should meet CC-1's vessel (the "Transfer Location").

b.   CC-1 further informed CS-2, CS-3, and CS-4 that, before his vessel met the CSes' boat, the vessel would be loaded with cocaine from SHERVINGTON LOVELL, the defendant, and CC-2.

c.   CC-1 and the CSes agreed to communicate via radio at particular frequencies, using "pesca" as a code word.

### The July 5 Meeting

9.   On or about July 5, 2018, at the DEA's direction, the CSes again met with CC-1, and subsequently met with SHERVINGTON LOVELL, the defendant, and CC-2, in Georgetown, Guyana (the "July 5 Meeting"). From my review of a DEA report prepared based on the CSes' recollections of the July 5 Meeting, which was recorded, I have learned, among other things, the following:

a.   The CSes agreed to pay CC-1 approximately $100,000, as well as 25 kilograms of cocaine, in return for the shipment of cocaine. The CSes provided CC-1 with approximately $45,600 in cash.

b.   The CSes informed CC-1 that 100 kilograms of the cocaine shipment belonged to CC-4.

c.   CC-1 confirmed that his vessel would meet the CSes' boat at the Transfer Location, and informed the CSes that CC-1's vessel would meet the CSes' boat on July 25, 2018.

d.   The CSes and CC-1 then met with LOVELL and CC-2 in a hotel room, during which the following occurred, in substance and in part:

i. LOVELL stated that he had paid $100,000 to CC-1 for the upcoming cocaine shipment.

ii. CC-2 stated that he had approximately $135,000 available to pay CC-1.

iii. CC-1 stated that his vessel would meet a boat carrying LOVELL's and CC-2's cocaine approximately 300

miles off the coast of Guyana and Suriname, and would then continue to the Transfer Location on July 25, 2018.

    iv. CC-1 stated that the captain of the vessel was from Venezuela.

    v. CC-1 informed the CSes, LOVELL, and CC-2 that it would take approximately 12 to 15 days for the vessel to reach the Azores Islands, where the cocaine would be transferred to a fishing vessel (which the CSes believed referred to the Boat, see supra at ¶ 7(e)) arranged by CC-2 and CC-3.

    vi. CC-2 stated that it would take seven to ten days for the fishing vessel to arrive in the Netherlands after receiving the cocaine.

    vii. CC-2 also showed a photograph of the uniform of the fishing company that would be retrieving the cocaine shipment.

### The July 16, 2018 Meeting

  10. On or about July 16, 2018, at the DEA's direction, the CSes met with CC-4, and subsequently other individuals, in Bogota, Colombia (the "July 16 Meeting"). From my review of a DEA report prepared based on the CSes' recollections of the July 16 Meeting, which was recorded, I have learned, among other things, the following:

    a. CS-1 described the upcoming maritime drug shipment that CC-4, the CSes, SHERVINGTON LOVELL, the defendant, and CC-2 were planning, explaining that the CSes and CC-4 had invested a total of 650 kilograms of cocaine, of which 100 kilograms belonged to CC-4.

    b. CS-1 related CS-1's understanding that CC-4 had already provided approximately $295,000 in payment for the venture. CC-4 confirmed that the money provided to CS-1 for the upcoming venture belonged to CC-4 and had been laundered from South Africa.

    c. CS-1 described that on July 25, 2018, the vessel belonging to CC-1 would retrieve cocaine from CS-1 and CC-4 approximately 500 miles from Trinidad and Tobago, and would drop off that cocaine between the Azores Islands and Ireland.

      d. CC-4 stated that the area suggested near the Azores Islands might have airplanes that surveil boats, and explained that, should CC-1 have any problem with the receipt of cocaine in that area, CC-4 could receive cocaine in Bir Gandouz, on the coast of Western Sahara, with the assistance of the "Tuaregs."

      e. After CS-1 showed a photograph of CC-1's vessel, which CC-1 had previously provided to CS-1 (the "Photograph"), to CC-4, CC-4 noted that the same vessel had been used in previous cocaine shipments that CC-4 had received from CC-1.

      f. An associate of CC-4 who later joined the meeting ("CC-5") provided $50,000 to an individual ("CC-6") whom CC-1 identified to CS-2 as CC-1's wife. The CSes, along with CC-4, subsequently contacted CC-1, to confirm that the money had been provided to CC-1 via CC-6.

      g. CC-4 informed CC-5, in substance and in part, that the money was being used for the upcoming maritime project.

### The July 18 Message

    11. On or about July 18, 2018, CC-2 sent an encrypted text message to CS-1, stating: "Ok he told me the bus departs tomorrow and I'm meeting with him on Saturday." Based on the context of his prior communications with CC-2, CS-1 understood the "bus" to refer to the departure of CC-1's vessel carrying cocaine for SHERVINGTON LOVELL, the defendant, and CC-2.

### The July 27 Interdiction

    12. Based on my participation in this investigation, my conversations with USCG personnel and other law enforcement agents, and my review of documents obtained during the investigation, I have learned, among other things, the following:

      a. On or about July 27, 2018, two U.S. Coast Guard cutters (the "Cutters") operating in international waters approximately 350 nautical miles east of Diamond Valley, Barbados, at a location in the vicinity of the Transfer Location, and more than 12 nautical miles from the coast of any country, detected a small, low-profile vessel, approximately 80

feet in length (that is, the Vessel) that appeared to be displaying no indicia of nationality, by flag or otherwise.

          i. USCG personnel intercepted communications over a particular radio frequency in which at least one of the speakers used the word "pesca." See supra at ¶ 8(c) (discussing the use of "pesca" as a code word).

          ii. Based on my training, experience, and participation in this investigation, including my comparison of a photograph of the Vessel taken by USCG personnel with the Photograph, see supra at ¶ 10(e), it appears that the Vessel is the same vessel of which CC-1 had provided a photograph to CS-1, and that CS-1 had then shown to CC-4.

    13. The Cutters deployed USCG personnel, who approached and subsequently boarded the Vessel (the "Boarding Team"). The Boarding Team inspected the Vessel and found no documents or indicia of the Vessel's nationality on board.

    14. A passenger on board the Vessel identified himself as the "master" of the Vessel ("Passenger-1"). Passenger-1 was later identified as a Venezuelan national, as CC-1 had informed the CSes at the July 5 Meeting, see supra at ¶ 9(a)(iv), the vessel's captain would be.

    15. The Boarding Team also found what appeared, based on their training and experience, to be (i) an excessive quantity of fuel on board the Vessel; and (ii) an excessive supply of rations, which they believed, based on their training and experience, indicated that the passengers on the Vessel were intending to supply other vessels with additional fuel and rations.

    16. Members of the Boarding Team observed mattresses in the crew berthing area of the Vessel. Below the mattresses and the wooden planks beneath those mattresses, the Boarding Team located bales, or large bundles (the "Bales"), wrapped in green and clear plastic and packed in duffel bags (the "Duffel Bags") that appeared, based on their training and experience, to contain narcotics.

    17. Two samples from the Bales field-tested positive for the presence of cocaine.

    18. The Boarding Team recovered approximately 16 large duffel bags from the Vessel, each of which contained

8

Bales.  In total, the contents of the Bales weighed approximately 624 kilograms.

19.  The Boarding Team also recovered a magazine containing approximately 30 rounds of ammunition.

### The August 10 Meeting

20.  On or about August 10, 2018, at the DEA's direction, the CSes met with CC-4 in Medellin, Colombia (the "August 10 Meeting").  From my review of a DEA report prepared based on the CSes' recollections of the August 10 Meeting, which was recorded, I have learned, in substance and in part, that, during the August 10 Meeting, the CSes and CC-4 discussed, in substance and in part, that, as a result of the Vessel's interdiction, CC-1 owed the CSes and CC-4 $260,000.

21.  Based on the foregoing -- including, among other things, the timing and location of the Vessel's interdiction, the Vessel's captain's nationality, the Vessel's appearance, and the substance of the CSes' August 10, 2018 meeting with CC-4 -- it appears that the Vessel contained a portion of the maritime cocaine shipment planned by SHERVINGTON LOVELL, the defendant, CC-1, CC-2, CC-4, and the CSes.  Specifically, the Bales appear to have constituted the portion of the cocaine contributed by LOVELL and CC-2 prior to the anticipated loading of additional cocaine supplied by the CSes and CC-4.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of SHERVINGTON LOVELL, the defendant, and that he be imprisoned or bailed, as the case may be.

FURTHER, the Government respectfully moves for the Complaint and arrest warrant to remain sealed -- with the exception that the complaint and arrest warrant are unsealed for the limited purpose of disclosing the existence of or disseminating the Complaint and/or arrest warrant to relevant United States, foreign, or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant or to secure the defendant's arrest, extradition, or expulsion, or as otherwise required for purposes of national security.

_____
JEFFREY E. STRATTON
Special Agent
Drug Enforcement Administration

Sworn to before me this
15th day of October 2018

_____
HONORABLE GABRIEL W. GORENSTEIN
Chief United States Magistrate Judge
Southern District of New York