UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

DAVID CARDONA-CARDONA,
ARGEMIRO ZAPATA-CASTRO,
SHERVINGTON LOVELL, AND
STEVEN ANTONIUS,

Defendants.

MEMORANDUM
OPINION & ORDER

(S1) 18 Cr. 601 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Count Seven of (S1) Indictment 18 Cr. 601 charges David Cardona-Cardona, Argemiro Zapata-Castro, Shervington Lovell, and Steven Antonius (together, "Defendants") with conspiracy to violate the maritime drug enforcement laws of the United States, in violation of 46 U.S.C. §§ 70503, 7054(b), and 70506(b), and 18 U.S.C. § 3238.  ((S1) Indictment (Dkt. No. 39))

Defendants have moved to dismiss Count Seven, arguing that it violates their Fifth Amendment right to due process because (1) they were never on board a vessel that was subject to the jurisdiction of the United States; and (2) there is no nexus between their alleged criminal conduct and the United States.[1]  (Def. Br. (Dkt. No. 217) at 7)[2]

---

[1] On March 16, 2020, Zapata-Castro pled guilty to Count Seven before Magistrate Judge Aaron. (Dkt. No. 294)  This Court has not yet accepted Zapata-Castro's guilty plea.  In an October 15, 2020 letter (Dkt. Nos. 377, 378), Zapata-Castro asserts that he did not understand and did not agree to certain Guidelines stipulations set forth in his plea agreement.  (Id.)  In any event, the plea agreement does not address the instant motion to dismiss.

[2] Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.

For the reasons stated below, Defendants' motion to dismiss Count Seven will be denied.

## BACKGROUND

### I.  FACTS

The Government claims that between April 2018 and July 2018, the Defendants conspired to transport by sea 1400 kilograms of cocaine from Guyana to the Netherlands. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶¶ 6-11; Lovell Cmplt. (Dkt. No. 1) ¶¶ 6-11; Antonius Cmplt. (Dkt. No. 1) ¶¶ 6-11; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 23-29); see also Zapata-Castro Guilty Plea Tr. (Dkt. No. 294) at 22-23)

According to the Government, on April 18, 2018, two confidential sources of the Drug Enforcement Administration ("DEA") met with Defendants Zapata-Castro, Lovell, Antonius, and an unidentified co-conspirator at a hotel in Georgetown, Guyana.  The meeting was recorded by the DEA sources.  At the meeting, Zapata-Castro, Lovell, Antonius, and the unidentified co-conspirator discussed transporting 400 kilograms of cocaine from South America to the Netherlands.  Zapata-Castro offered to arrange the transportation.  Lovell expressed concern about how he could repatriate his share of the cocaine proceeds from the Netherlands. (Zapata-Castro Guilty Plea Tr. (Dkt. No. 294) at 22-23; Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 6; Lovell Cmplt. (Dkt. No. 1) ¶ 6; Antonius Cmplt. (Dkt. No. 1) ¶ 6; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 24)

On June 5, 2018, the two DEA sources met with Zapata-Castro, Lovell, and Antonius at a residence in Montego Bay, Jamaica.  The DEA sources recorded the meeting. Zapata-Castro, Lovell, Antonius, and the DEA sources again discussed transporting by sea a large quantity of cocaine from South America to the Netherlands.  All the participants in the meeting agreed to contribute quantities of cocaine to the shipment.  The DEA sources said that

they would do so in conjunction with Cardona-Cardona.  Zapata-Castro told the other attendees that he would purchase three months of rations for the voyage, and that he would be using a vessel that he had previously used for a cocaine transaction with Cardona-Cardona.  Zapata-Castro estimated that transporting the cocaine would cost approximately $400,000.  Lovell, Antonius, and the DEA sources all agreed to contribute towards the transportation expense. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 7; Lovell Cmplt. (Dkt. No. 1) ¶ 7; Antonius Cmplt. (Dkt. No. 1) ¶ 7; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 25)

The attendees agreed that Zapata-Castro's vessel would deliver the cocaine to another vessel located off the coast of Ireland.  The second vessel would be provided by Antonius, and would transport the cocaine from Ireland to its final destination in the Netherlands. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 7; Lovell Cmplt. (Dkt. No. 1) ¶ 7; Antonius Cmplt. (Dkt. No. 1) ¶ 7; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 25)

On June 23, 2018, three DEA sources met with Zapata-Castro in Georgetown, Guyana.  The DEA sources recorded the meeting.  At the meeting, Zapata-Castro provided one of the DEA sources with coordinates at which the DEA sources' purported vessel should meet Zapata-Castro's vessel for purposes of transferring the DEA sources' cocaine onto Zapata-Castro's vessel (the "Transfer Location").  Zapata-Castro told the DEA sources that before his vessel rendezvoused with the DEA sources' purported vessel, it would have been loaded with cocaine supplied by Lovell and Antonius.  Zapata-Castro and the DEA sources agreed to communicate by radio over certain frequencies, using the code word "pesca."  (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 8; Lovell Cmplt. (Dkt. No. 1) ¶ 8; Antonius Cmplt. (Dkt. No. 1) ¶ 8; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 26)

On July 5, 2018, DEA sources met with Zapata-Castro, Lovell, and Antonius in Georgetown, Guyana. The DEA sources recorded the meeting. The DEA sources initially met with Zapata-Castro alone. The DEA sources agreed to pay Zapata-Castro $100,000 and to give him twenty-five kilograms of cocaine in exchange for transporting the shipment of cocaine. The DEA sources gave Zapata-Castro $45,600 in cash at the meeting. The DEA sources also told Zapata-Castro that 100 kilograms of the cocaine shipment belonged to Cardona-Cardona. Zapata-Castro and the DEA sources agreed that the DEA sources' vessel would rendezvous with Zapata-Castro's vessel – at the Transfer Location – on July 25, 2018. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 9; Lovell Cmplt. (Dkt. No. 1) ¶ 9; Antonius Cmplt. (Dkt. No. 1) ¶ 9; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 27)

The DEA sources and Zapata-Castro then met with Lovell and Antonius in a Georgetown hotel room. Lovell stated that he had paid Zapata-Castro $100,000 for the planned transport of cocaine. Antonius said that he had $135,000 available to pay Zapata-Castro. Zapata-Castro said that his vessel would meet a boat carrying Lovell and Antonius's cocaine approximately 300 miles off the coast of Guyana and Suriname. Lovell and Antonius's cocaine would be transferred to Zapata-Castro's vessel, which would then proceed to the Transfer Location on July 25, 2018. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 9; Lovell Cmplt. (Dkt. No. 1) ¶ 9; Antonius Cmplt. (Dkt. No. 1) ¶ 9; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 27)

Zapata-Castro also told the attendees that the captain of his vessel was from Venezuela, and that it would take approximately twelve to fifteen days for his vessel to arrive in the Azores. Once the vessel reached the Azores, the cocaine would be transferred to a fishing vessel. According to Zapata-Castro, Antonius and Lovell had arranged for the fishing vessel. Antonius stated that it would take seven to ten days for the fishing vessel to arrive in the

Netherlands. Antonius also displayed a photograph of the uniform worn by employees of the fishing company whose vessel would take custody of the cocaine. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 9; Lovell Cmplt. (Dkt. No. 1) ¶ 9; Antonius Cmplt. (Dkt. No. 1) ¶ 9; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 27)

On July 16, 2018, the DEA sources met with Cardona-Cardona in Bogota, Colombia. The DEA sources recorded the meeting. One of the DEA sources described the upcoming maritime drug shipment that Cardona-Cardona, Antonius, Lovell, and the DEA sources had been planning, and told Cardona-Cardona that the DEA sources and Cardona-Cardona had contributed a total of 650 kilograms of cocaine to the shipment, of which 100 kilograms belonged to Cardona-Cardona. The DEA source confirmed with Cardona-Cardona that he had provided $295,000 towards the venture. Cardona-Cardona said that the funds had been laundered in South Africa. The DEA source told Cardona-Cardona that on July 25, 2018, Zapata-Castro's vessel would take custody of the cocaine belonging to the DEA source and Cardona-Cardona at a location approximately 500 miles from Trinidad and Tobago. Zapata-Castro's vessel would then transport the cocaine to a location between the Azores and Ireland. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 10; Lovell Cmplt. (Dkt. No. 1) ¶ 10; Antonius Cmplt. (Dkt. No. 1) ¶ 10; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 28)

Cardona-Cardona expressed concern that the area around the Azores might be subject to aircraft surveillance. Cardona-Cardona said that if surveillance proved to be a problem, Cardona-Cardona could arrange to receive the cocaine in Bir Gandouz, off the coast of Western Sahara. The DEA source showed Cardona-Cardona a photograph of Zapata-Castro's vessel, which Zapata-Castro had provided to the DEA source. Cardona-Cardona commented that Zapata-Castro had previously used the same vessel to deliver cocaine to Cardona-Cardona.

(Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 10; Lovell Cmplt. (Dkt. No. 1) ¶ 10; Antonius Cmplt. (Dkt. No. 1) ¶ 10; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 28)

On July 18, 2018, Antonius sent a text message to a DEA source stating, "he told me the bus departs tomorrow and I'm meeting with him on Saturday." The Government contends that the "bus" refers to the departure of Zapata-Castro's vessel carrying cocaine supplied by Antonius and Lovell. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶ 11; Lovell Cmplt. (Dkt. No. 1) ¶ 11; Antonius Cmplt. (Dkt. No. 1) ¶ 11; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 29)

On July 27, 2018, two U.S. Coast Guard cutters operating in international waters in the vicinity of the Transfer Location – approximately 350 nautical miles east of Diamond Valley, Barbados – observed a small vessel, approximately 80 feet in length, that did not appear to be displaying any indicia of nationality. Coast Guard personnel intercepted radio communications from the vessel in which the word "pesca" was used. The vessel appeared to be the same vessel shown in the photograph that Zapata-Castro had given to a DEA source, and which the source had shown to Cardona-Cardona. Coast Guard personnel boarded the vessel and found no documents or other indicia of the vessel's nationality. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶¶ 12-13; Lovell Cmplt. (Dkt. No. 1) ¶¶ 12-13; Antonius Cmplt. (Dkt. No. 1) ¶¶ 12-13; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 30)

Defendant Godofredo Leandro Gonzalez, one of the six individuals on board the vessel, identified himself as its master. Gonzalez – who is a Venezuelan national – told Coast Guard personnel "that the purpose of the crew's voyage was drug[-]related," and that he could not claim any nationality for the vessel. (Gonzalez Cmplt. (Dkt. No. 1) ¶ 6; Gonzalez Guilty Plea Tr. (Dkt. No. 120) at 17-18) A search of the vessel revealed an excessive quantity of fuel and rations. The search also revealed sixteen large duffel bags that contained 624 kilograms of

cocaine and approximately thirty rounds of ammunition. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶¶ 15-19; Lovell Cmplt. (Dkt. No. 1) ¶¶ 15-19; Antonius Cmplt. (Dkt. No. 1) ¶¶ 15-19; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 30)

On August 10, 2018, the DEA sources met with Cardona-Cardona in Medellin, Colombia. The DEA sources recorded the meeting. At that meeting, the DEA sources and Cardona-Cardona discussed the fact that as a result of the loss of the vessel to the Coast Guard on July 27, 2018, Zapata-Castro owed the DEA sources and Cardona-Cardona $260,000. Based on this discussion in Medellin, the timing and location of the vessel's interdiction, the nationality of the vessel's captain, and the vessel's appearance, the Government alleges that the seized vessel contained a portion of the cocaine that Defendants Zapata-Castro, Lovell, Antonius, and Cardona-Cardona had conspired to transport from Guyana to the Netherlands. More specifically, the Government claims that the seized vessel was carrying cocaine contributed by Antonius and Lovell. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶¶ 20-21; Lovell Cmplt. (Dkt. No. 1) ¶¶ 20-21; Antonius Cmplt. (Dkt. No. 1) ¶¶ 20-21; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 31-32)

Cardona-Cardona and Zapata-Castro – who lives in Guyana – are citizens of Columbia. (Def. Br. (Dkt. No. 217) at 11; Tulman Decl. (Dkt. No. 220)) Antonius is a citizen of Suriname. Lovell is a citizen of Guyana. (Id.) Antonius, Lovell, and Zapata-Castro were arrested in Jamaica (Dec. 7, 2018 Conf. Tr. (Dkt. No. 60) at 2), while Cardona-Cardona was arrested in Zagreb, Croatia. (Def. Br. (Dkt. No. 217) at 11)

## II.     PROCEDURAL HISTORY

Defendants Cardona-Cardona, Zapata-Castro, Lovell, and Antonius filed the instant motion to dismiss Count Seven of the (S1) Indictment on February 10, 2020. (Def. Mot. (Dkt. No. 215)) The Government filed its opposition on February 25, 2020. (Govt. Opp. (Dkt. No. 243))

7

In an August 28, 2020 order, this Court directed the parties to submit supplemental briefing addressing the Second Circuit's decision in United States v. Alarcon Sanchez, No. 18-1231, 2020 WL 508496 (2d Cir. Aug. 27, 2020).  (Dkt. No. 333)  On September 4, 2020, the parties filed supplemental briefing.  (See Def. Ltr. (Dkt. No. 338); Govt. Ltr. (Dkt. No. 339))

## DISCUSSION

Defendants contend that Count Seven of the (S1) Indictment must be dismissed as violative of their Fifth Amendment due process rights because (1) they were never on board a vessel that was subject to the jurisdiction of the United States; and (2) there is no nexus between their alleged criminal conduct and the United States.  (Def. Br. (Dkt. No. 217) at 7)

**I.      APPLICABLE LAW**

Article I, Section 8 of the Constitution – the "Define and Punish Clause" – grants Congress authority to "define and punish piracies and felonies committed on the high seas, and offenses against the law of nations. . . ."  U.S. Const. art. I § 8, cl. 10.  The Supreme Court has read this clause to grant Congress the authority to define and punish piracy, felonies on the high seas, and offenses against the law of nations.  See United States v. Smith, 18 U.S. 153, 158-59 (1820).  In enacting the Maritime Drug Law Enforcement Act (the "MDLEA"), Congress invoked its constitutional power "[t]o define and punish Piracies and Felonies committed on the high Seas."  U.S. Const. art. I § 8, cl. 10; see also United States v. Alarcon Sanchez, 972 F.3d 156, 166 (2d Cir. 2020) (emphasis omitted).

The MDLEA makes it unlawful to "knowingly or intentionally" "manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance" on board "a vessel of the United States or a vessel subject to the jurisdiction of the United States," or to conspire to do the same.  46 U.S.C. §§ 70503(a), 70506(b) ("A person attempting or conspiring

8

to violate section 70503 of this title is subject to the same penalties as provided for violating section 70503."); Alarcon Sanchez, 972 F.3d at 164 (noting that the MDLEA "imposes criminal liability on those 'attempting or conspiring to violate section 70503' – that is, attempting to engage in prohibited drug trafficking activity on board a covered vessel or conspiring with others to do so – and makes such persons 'subject to the same penalties as provided for violating section 70503'"). And as the Second Circuit acknowledged in Alarcon Sanchez, the prohibitions set forth in Section 70503(a) "appl[y] even though the act [at issue] is committed outside the territorial jurisdiction of the United States." 46 U.S.C. § 70503(b); see also Alarcon Sanchez, 972 F.3d at 166.

The MDLEA defines a "vessel subject to the jurisdiction of the United States" to include a "vessel without nationality." 46 U.S.C. § 70502(c)(1)(A). A "vessel without nationality" under the Act includes:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1)(A)-(C).

> A claim of nationality or registry under [the MDLEA] includes only --
>
> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
>
> (2) flying its nation's ensign or flag; or

>  (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e)(1)-(3).

Title 46, United States Code, Section 70504(b)(2) provides that

> [a] person violating section 70503 or 70508[,] if the offense was begun or committed upon the high seas, or elsewhere outside the jurisdiction of any particular State or District, may be tried in any district.

Title 18, United States Code, Section 3238 provides that

> [t]he trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

In Alarcon Sanchez, the Second Circuit considered whether foreign land-based conspirators could be held liable under the MDLEA. In that case, the defendants conspired with a Colombian drug cartel to coordinate a shipment of cocaine from Colombia to Australia in April 2015. Alarcon Sanchez, 972 F.3d at 159-60. A Government informant told the defendants that he could arrange transport for the cocaine, and he later confirmed to the defendants that he had secured the use of a U.S.-registered vessel. Id. at 160. One of the conspirators arranged for the Government's informant to be paid $3000 in New York City to obtain Australian visas. Id. Other conspirators were to bring the cocaine on two speedboats to an agreed-upon location in the Pacific Ocean, where it would be loaded onto a vessel bound for Australia. Id.

On April 14, 2015, U.S. Navy personnel spotted one of the two speedboats, boarded the vessel, and recovered approximately 550 kilograms of cocaine. Id. The vessel had no visible registration number, but a small Ecuadorian flag was

10

painted by the engine. Id. The crew members stated that they were Colombian citizens, and the captain told the boarding team that the vessel was an Ecuadorian vessel with a home port of Puerto Manta, Ecuador. Id. Pursuant to a treaty between the United States and Ecuador, U.S. Coast Guard personnel asked Ecuadorian authorities to confirm or deny the vessel's nationality. Id. Ecuador could not do so based on the information provided, and the Coast Guard concluded that the vessel was without nationality. Id. at 161. The Second Circuit concluded that the Government had satisfied its burden to demonstrate that the vessel was a "vessel without nationality" as defined in 46 U.S.C. § 70502(d)(1)(C), and therefore subject to U.S. jurisdiction. Id. at 164.

Alarcon Sanchez argued that the MDLEA charge should have been dismissed, because "the application of the MDLEA to his foreign land-based conspiratorial conduct violates the Constitution's Define and Punish Clause and Due Process Clause." Id. Relying on, inter alia, the Constitution's Necessary and Proper Clause, the Second Circuit rejected that argument:

> We do not read the MDLEA so narrowly. Most obviously, the attempt-and-conspiracy provision does not mention covered vessels at all. It requires only that the object of the conspiracy encapsulate conduct that violates one of the specified narcotics trafficking prohibitions on a covered vessel. Persons who knowingly and intentionally join in such a conspiracy need not themselves be on board the covered vessel to be guilty under Section 70506.
> . . . .
> . . . [P]rosecuting MDLEA conspirators who are not on the high seas is a means that is rationally related to the legitimate end of prosecuting MDLEA conspirators who are on the high seas. . . . Our conclusion is reinforced by recognition that the conspirators most likely to control, direct, finance, and profit from such drug trafficking are more apt to remain on land than to venture on the seas. . . . In order reasonably to address the serious problem of drug trafficking on the high seas, it is, therefore, necessary and proper for Congress to confer federal jurisdiction over all conspirators, both those who go on the seas and those who remain on land.

Id. at 165, 167 (citing United States v. Ballestas, 795 F.3d 138, 145, 146 (D.C. Cir. 2015)).

"[C]onstruing the MDLEA's attempt-and-conspiracy provision to reach conspirators who remain onshore is consistent with traditional notions of conspirator liability. . . . It is not necessary that all conspirators be on board a covered vessel for each to be guilty of conspiring to violate Section 70503." Id. at 165.  Section 70506(b) of the MDLEA "encompasses conspiratorial conduct on shore in a foreign country." Id. at 166.

Alarcon Sanchez also argued that "the Due Process Clause requires some nexus or connection between [a] defendant and the United States in order for the MDLEA to cover land-based conspirators." Id. at 168.  The Second Circuit acknowledged that

> [a]s a general rule the extraterritorial application of federal criminal law requires such a nexus so that a statute's application is not arbitrary or fundamentally unfair. . . . However, we also held in [United States v.] Van Der End that no such nexus is required when MDLEA violations occur on stateless vessels because "MDLEA prosecutions involving stateless vessels do not present the same concerns that are present in the extraterritorial application of typical criminal statutes." [943 F.3d 98, 105 (2d Cir. 2019).]  As we further explained:
>
> > That is because stateless vessels are international pariahs that subject themselves to the jurisdiction of all nations solely as a consequence of the vessel's status as stateless.  Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws.  Thus, when a vessel is subject to the jurisdiction of another nation, a person trafficking drugs on board would have a legitimate expectation that because he has subjected himself to the laws of one nation, other nations will not be entitled to exercise jurisdiction without some nexus.  The same is not true when a defendant attempts to avoid the law of all nations by travelling on a stateless vessel.
>
> Id. at 105-06 (internal quotation marks and citations omitted).
>
> In reaching this conclusion, we held that United States prosecution of persons on stateless vessels was neither arbitrary nor unfair.  Not arbitrary, because any nation can exercise jurisdiction over such vessels.  And not unfair, because persons who traffic drugs do so with the imputed knowledge that they are risking prosecution – "somewhere." Id. at 106.

Alarcon Sanchez, 972 F.3d at 168.

12

The Alarcon Sanchez court went on to distinguish Van Der End, however, noting that in that case the court had left open the question of "'what the Due Process Clause may require before persons who are not on board a vessel without nationality' can be prosecuted under the MDLEA." Id. (quoting Van Der End, 943 F.3d at 105 n.4) (emphasis added in Alarcon Sanchez). The Alarcon Sanchez court further noted that while the Van Der End defendants were operating on a stateless vessel and were thus "fair game for any nation to 'subject them to their laws,'" the Alarcon Sanchez defendants had engaged in their unlawful acts in Columbia, and "were obviously subject to Columbia's jurisdiction and laws." Id. at 169. The Alarcon Sanchez court went on to rule that even "assum[ing] that land-based conspirators who are not physically on board a stateless vessel can raise a nexus challenge to a MDLEA prosecution, that does not help defendants here." Id. at 169.

The Alarcon Sanchez court explained that, "'[f]or non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interest.'" Id. at 169 (quoting United States v. Epskamp, 832 F.3d 154, 168 (2d Cir. 2016)). The Alarcon Sanchez defendants had conspired "to ship over 500 kilograms of cocaine on the high seas, using a U.S.-registered vessel and procuring false visas in the United States." Id. "Alarcon Sanchez [had thus] 'caused harm' to the very U.S. interests animating the MDLEA: curtailing international drug trafficking on the high seas." Id.

## II. ANALYSIS

Defendants do not dispute that the vessel interdicted by the U.S. Coast Guard in international waters on July 27, 2018 – and found to contain 624 kilograms of cocaine – was a "vessel without nationality." 46 U.S.C. § 70502(c)(1)(A). No indicia of nationality was displayed on the vessel; no documents or other indicia of the vessel's nationality were found

13

onboard; and the master of the vessel told Coast Guard personnel that he could not claim any nationality for the vessel. (Zapata-Castro Cmplt. (Dkt. No. 1) ¶¶ 13-14; Lovell Cmplt. (Dkt. No. 1) ¶¶ 13-14; Antonius Cmplt. (Dkt. No. 1) ¶¶ 13-14; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 30) Given these circumstances, the interdicted vessel was a "vessel without nationality." See 46 U.S.C. §§ 70502(d)(1)(A)-(C) and (e)(1)-(3). Because the Government alleges that Defendants were co-conspirators with those on the interdicted stateless vessel, the issue of whether Defendants' alleged foreign land-based conspiratorial acts can serve as the basis for a prosecution under 46 U.S.C. § 70506(b) is squarely presented.

As Defendants concede, Alarcon Sanchez is dispositive of that issue. The Second Circuit's decision forecloses Defendants' argument that foreign land-based conspiratorial conduct cannot serve as the basis for a prosecution under Section 70506(b). (Sept. 4, 2020 Def. Ltr. (Dkt. No. 339) at 1 ("acknowledg[ing] that Alarcon[ Sanchez] is binding precedent on this Court and that [Defendants'] . . . argument [that foreign land-based conspiratorial conduct cannot serve as the basis for a prosecution under the MDLEA] will fail"))

Defendants contend, however, that Alarcon Sanchez does not resolve their remaining argument: that this prosecution violates their due process rights because there is no nexus between their alleged criminal conduct and the United States. (Id. at 2; see also Def. Br. (Dkt. No. 217) at 12-18)

The Government responds that the MDLEA "does not require . . . a nexus between the United States and MDLEA violations that transpire on a vessel without nationality." (Govt. Br. (Dkt. No. 243) at 8 (citing Van Der End, 943 F.3d at 105); see also Sept. 4, 2020 Govt. Ltr. (Dkt. No. 338)) According to the Government, "the MDLEA is constitutionally applied to individuals . . . who conspire with others on board a stateless vessel even when there is

no nexus to the United States." (Govt. Br. (Dkt. No. 243) at 8; see also Sept. 4, 2020 Govt. Ltr. (Dkt. No. 338) at 2-5) And "[t]here is nothing unfair about the fact that [Defendants'] prosecution occurred here in the United States, because the Defendants knew that they were conspiring to unlawfully ship over 1,000 kilograms of cocaine, which they knew could lead to their eventual prosecution." (Sept. 4, 2020 Govt. Ltr. (Dkt. No. 338) at 4-5)

A.     **The Required Nexus with the United States**

As an initial matter, there is no question that the MDLEA has extraterritorial application. The statute explicitly provides that its prohibitions apply to acts committed outside the territorial jurisdiction of the United States. See 46 U.S.C. § 70503(b); see also Alarcon Sanchez, 972 F.3d at 169 ("[T]he MDLEA "indisputably applies extraterritorially.""); Van Der End, 943 F.3d at 105 ("[T]he MDLEA indisputably has extraterritorial application. (citing 46 U.S.C. § 70503(b))).

Where, as here, "Congress expressly intends for a statute to apply extraterritorially, . . . the burden is a heavy one for a defendant seeking to show that extraterritorial application of the statute violates due process." Epskamp, 832 F.3d at 168 (internal quotation marks and citation omitted); see also Alarcon Sanchez, 972 F.3d at 169 ("Our precedent stresses that it is a heavy burden for defendants to demonstrate a due process violation in the application of a statute like the MDLEA, which indisputably applies extraterritorially." (citing Epskamp, 832 F.3d at 168)).

As to the nature of the nexus requirement, the Van Der End court explained that its purpose

> is to prevent extraterritorial application of U.S. criminal laws from being "arbitrary or fundamentally unfair." See Epskamp, 832 F.3d at 168 (internal quotation marks omitted); see also [Ballestas, 795 F.3d at 148] (same). That "ultimate question" of arbitrariness or unfairness, Ballestas, 795 F.3d at 148 (internal quotation marks omitted), in turn, hinges in part on the notion of "fair

15

> warning." Epskamp, 832 F.3d at 169. "The idea of fair warning is that no [person] shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed." United States v. Al Kassar, 660 F.3d 108, 119 (2d Cir. 2011) (internal quotation marks omitted). "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." Id.
>
> In other words, no nexus is required for the government to bring MDLEA prosecutions against persons who are trafficking drugs on board stateless vessels because such prosecutions are not arbitrary, since any nation may exercise jurisdiction over stateless vessels, and they are not unfair, since persons who traffic drugs may be charged with knowledge that such activity is illegal and may be prosecuted somewhere. On that score, we have little trouble concluding that those who participate in international drug trafficking activity are aware that such conduct is illegal. See 46 U.S.C. § 70501 (congressional findings that "trafficking in controlled substances aboard vessels is a serious international problem [and] is universally condemned"). In this context, that is all due process requires.

Van Der End, 943 F.3d at 106.[3]

As discussed above, the Van Der End court left for another day the question of "what the Due Process Clause may require before persons who are not on board a vessel without nationality may be prosecuted for violating the MDLEA." Id. at 105 n.4.

In Alarcon Sanchez, the Second Circuit held that

> Section 70506(b) of the MDLEA encompasses land-based conspiratorial conduct, which Congress is authorized to proscribe under the Necessary and Proper Clause. Although due process requires a sufficient nexus with the United States for those not on board a stateless vessel to be prosecuted under the MDLEA, we conclude that in this instance, defendants' prosecutions satisfy due process.

Alarcon Sanchez, 972 F.3d at 159. In reaching this conclusion, the Second Circuit found that

> Alarcon Sanchez's MDLEA prosecution was neither arbitrary nor fundamentally unfair. By conspiring with an international drug-trafficking organization to ship over 500 kilograms of cocaine on the high seas, using a U.S.-registered vessel and

---

[3] At least four other circuits have also held that, for purposes of MDLEA prosecutions, presence on a stateless vessel "obviates the need for any showing of nexus." United States v. Moreno-Morillo, 334 F.3d 819, 828 (9th Cir. 2003); see also United States v. Victoria, 876 F.2d 1009, 1010-11 (1st Cir. 1989); United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993); United States v. Campbell, 743 F.3d 802, 812 (11th Cir. 2014).

16

> procuring false visas in the United States, Alarcon Sanchez "cause[d] harm" to the very U.S. interests animating the MDLEA: curtailing international drug trafficking on the high seas, which Congress found to be "a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. There can be no doubt that Alarcon Sanchez and his co-conspirators were aware that their scheme to transport cocaine on the high seas was illegal and could result in their criminal prosecution "somewhere." Al Kassar, 660 F.3d at 119 ("The defendants were not ensnared by a trap laid for the unwary."). Accordingly, in light of the conspiracy's nexus to United States interests in eliminating drug trafficking on the high seas, and the fair warning we ascribe to those that participate in such conspiracies, we conclude that due process was not offended by defendants' MDLEA prosecutions.

Id. at 169.

This Court does not read the MDLEA, its legislative history, or relevant case law as requiring a nexus to the United States beyond this nation's compelling interest in "curtailing international drug trafficking on the high seas." Id. (citing 46 U.S.C. § 70501).

As an initial matter, nothing in the Act suggests a requirement that the drugs at issue be destined for the United States; that some act in furtherance of the crime take place on U.S. soil; that a U.S. registered vessel is or will be used to transport the drugs; or that a U.S. citizen or resident be one of the conspirators. To the contrary, the statute is premised on the "specific threat to the safety of maritime navigation and the security of the United States" that "vessel[s] without nationality" present, and on Congressional findings that "trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501.

The Act's legislative history confirms that Congress did not intend that the reach of the statute be limited to cases in which the drugs at issue were destined for the United States:

> In 1980, Congress enacted the MDLEA's predecessor statute to close a loophole that had hampered the prosecution of drug smugglers apprehended on the high seas absent

17

> difficult-to-obtain evidence that the drugs were destined for the United States. S. Rep. No. 96-855, at 1-2 (1980).  As the Senate Report explains:
>
>> In most cases, evidence to prove importation or conspiracy beyond a reasonable doubt is impossible to obtain.  Thus, in most cases the Coast Guard is able to seize and confiscate the ship and the illegal drugs, but the government is not able to prosecute the crew or others involved in the smuggling operation.  Such actions have little deterrent effect on the crews or the trafficking organizations.  In the highly lucrative trade in illegal drugs, such occasional seizures are considered a part of the cost of doing business.

Alarcon Sanchez, 972 F.3d at 166 (quoting United States. S. Rep. No. 96-855, at 1-2 (1980)) (emphasis in Alarcon Sanchez).

While the Alarcon Sanchez court cites contacts with the United States not present here – including the fact that the Government's informant mentioned that the fictional vessel he would provide would be U.S.-registered, and that a conspirator arranged for the informant to receive $3000 in New York City in order to purchase Australian visas, id. at 160, 169 – this Court does not regard these incidental contacts with the United States as driving the Court's decision.  As here, the Alarcon Sanchez defendants never intended that their massive cocaine shipment ever have any contact with the United States; their intent was for the cocaine to travel from Colombia to Australia.  Id. at 160.  The court nevertheless found no due process violation in the defendants' prosecution under the MDLEA.  The reasoning of Alarcon Sanchez and Van Der End compels the same result here.

These cases tell us that while the purpose of the nexus requirement is to "prevent [the] extraterritorial application of U.S. criminal laws from being 'arbitrary or fundamentally unfair,'" Van Der End, 943 F.3d at 106 (quoting Epskamp, 832 F.3d at 168), no such nexus is required when MDLEA violations occur on stateless vessels, because "MDLEA prosecutions involving stateless vessels do not present the same concerns that are present in the extraterritorial application of typical criminal statutes." Id. at 105.  "That is because stateless vessels are

18

international pariahs that subject themselves to the jurisdiction of all nations solely as a consequence of the vessel's status as stateless. Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws." Id. (internal quotation marks and citations omitted).

Alarcon Sanchez and Van Der End also make clear that there is no due process requirement that Cardona-Cardona and the other alleged co-conspirators here understood that their plan to transport huge amounts of cocaine from South America to the Netherlands would subject them to criminal liability in the United States. "'Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.'" Alarcon Sanchez, 972 F.3d at 169 (quoting Van Der End, 943 F.3d at 106). "There can be no doubt that [Cardona-Cardona] and his co-conspirators were aware that their scheme to transport cocaine on the high seas was illegal and could result in their criminal prosecution 'somewhere.'" Id. (quoting Al Kassar, 660 F.3d at 119).

Here, as in Alarcon Sanchez, the Government's MDLEA prosecution is "neither arbitrary nor fundamentally unfair." In conspiring to commit the alleged international drug trafficking crime – which involved transporting 1400 kilograms of cocaine across two continents, and at enormous expense – Defendants struck at "the very U.S. interests animating the MDLEA: curtailing international drug trafficking on the high seas, which Congress found to be 'a specific threat to the security and societal well-being of the United States.'" Id. (quoting 46 U.S.C. § 70501). According to Congress, such high-level, international drug trafficking constitutes a threat to the United States whether or not the specific drugs at issue are destined for this nation, and whether or not U.S. citizens or instrumentalities are involved. "[I]n light of the

conspiracy's nexus to United States interests in eliminating drug trafficking on the high seas, and the fair warning [the Second Circuit] ascribe[s] to those that participate in such conspiracies, [this Court] concludes that due process [is] not offended by [D]efendants' MDLEA prosecutions." Id.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Count Seven of the (S1) Indictment is denied.

Dated: New York, New York
       November 11, 2020

SO ORDERED.

*Paul S. Gardephe*

Paul G. Gardephe
United States District Judge